# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan B. Gottschall | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 2362 | **DATE** | 11/9/2004 |
| **CASE TITLE** | Dalen vs. Kubiesa | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due _____. Reply to answer brief due _____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Order. Following a two-day bench trial – having examined the entire record and having determined the credibility of witnesses – the court rules in favor of defendants on Count III of plaintiff's complaint (the sole remaining claim in this case). Plaintiff's motion to strike portions of defendants' "bench memorandum" [119-1] is denied as moot.

(11) ☐ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | **NOV 1 0 2004** | |
| | Notified counsel by telephone. | | date docketed | |
| X | Docketing to mail notices. | | | |
| X | Mail AO 450 form. | | GMA | 124 |
| | Copy to judge/magistrate judge. | | docketing deputy initials | |
| | | | date mailed notice | |
| RJ/TL | courtroom deputy's initials | | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

THOMAS C. RICHARDSON, Trustee of )
the Bankruptcy Estate of )
MARK G. DALEN, )
                                          )
                Plaintiff, )
                                          )     Case No. 98-C-2362
      vs. )
                                          )
KENNETH T. KUBIESA, et al., )     Judge Joan B. Gottschall
                                          )
              Defendants )

**DOCKETED**

**NOV 1 0 2004**

## MEMORANDUM OPINION AND ORDER

    Plaintiff Thomas Richardson, trustee for the estate of Mark G. Dalen ("Dalen"), sued Dalen's former attorney, Kenneth T. Kubiesa ("Kubiesa") and Kubiesa's former law firm, Power & Cronin, Ltd. ("Power"), alleging that Kubiesa committed legal malpractice by (1) failing to adequately represent Dalen's interests during the sale of Dalen's 50% share in Metropolitan Plant and Flower, Inc. ("Metropolitan") (Count I), (2) failing to adequately represent Dalen's creditor interests during Metropolitan's subsequent bankruptcy (Count II), and (3) failing to inform Dalen of the risks presented by an adversary action filed against Dalen by Metropolitan's principals and failing to inform Dalen of an opportunity to settle that adversary action for less than $100,000 (Count III).

    The court granted summary judgment in favor of defendants on Counts I and II of the complaint; only Count III remains. On October 25-26, 2004, the court conducted a two-day bench trial on Dalen's remaining malpractice claim and the parties have each submitted written closing statements. Additionally, defendants have filed a "Bench Memorandum" which the court has taken with the case. Having examined the entire record and having determined the credibility of witnesses, after viewing their demeanor and considering their interests, the court finds that plaintiff has failed to establish the elements of his claim by a preponderance of the evidence and, therefore, rules in

124

favor of defendants on Count III of plaintiff's compaint.

## BACKGROUND[1]

### *Dalen's Sale Of His 50% Share Of Metropolitan*

In 1991, Mark Dalen started Metropolitan – which manufactured and sold artificial flowers, houseplants and trees – with one of his longtime business associates, Maxwell "Mack" Clamage, and Mack Clamage's son, Ed Clamage. Dalen owned a 50% stake in Metropolitan and the remaining 50% of the company was owned by the Clamages. Metropolitan was immediately successful and grew rapidly. However, as their company grew, disagreements began to arise between Dalen and the Clamages about how the business should be run. Eventually, the relationship between Dalen and the Clamages deteriorated to the point that the Clamages sought to buy-out Dalen's share of the company. Dalen agreed to enter negotiations to sell his shares and hired defendant Kubiesa – Dalen's friend and longtime legal counsel – to represent him in the sale. Dalen and the Clamages eventually settled on a purchase price of approximately $3.6 million, including a $1.1 million down payment and the remainder to be paid over time. After several banks refused to provide financing for the transaction, the Clamages finally obtained financing for the purchase price from NBD Bank ("NBD"). On April 18, 1994, both the financing transaction and the stock purchase closed.

### *Metropolitan's Bankruptcy And The Adversary Claim Against Dalen*

For a while, Metropolitan made regular payments to Dalen. Including its $1.1 million down payment, Metropolitan paid Dalen a total of $1.9 million. However, by September of 1995, Metropolitan's financial condition began to decline, in part due to the enormous debt burden that Metropolitan assumed in purchasing Dalen's shares. Strapped for cash, Metropolitan stopped making payments due Dalen in October of 1995. Even with that temporary relief, Metropolitan's

---

[1] The facts contained herein are either undisputed or the court has made the finding based on the credibility of a witness's testimony or the relevance of a particular piece of evidence. Where necessary, the court will comment on the credibility and relevance of the testimony or evidence at issue and the weight it has been given in the context of all the evidence received by the court.

financial woes deepened and on February 14, 1996, Metropolitan filed a Chapter 11 bankruptcy petition in the Northern District of Illinois.

On April 15, 1996, Metropolitan (now wholly owned by the Clamages) filed an amended adversary complaint in the bankruptcy court against NBD and Dalen, seeking to set aside the sale of Dalen's shares to Metropolitan as a fraudulent conveyance. Specifically, the Clamages alleged that the purchase of the Dalen shares was an illegal leveraged buy-out, that the purchase price was not justified by Metropolitan's then-existing assets, and that Dalen knew that the purchase would drive Metropolitan into insolvency. The Clamages demanded the return of the $1.9 million that Metropolitan paid Dalen for the shares.

### *Efforts to Settle the Adversary Claim*

During a hearing on the adversary claim, Bankruptcy Court Judge Susan Sonderby recommended that the parties attempt to resolve their dispute by engaging in a settlement conference mediated by Bankruptcy Court Judge Ronald Barliant. The parties agreed and conducted a settlement conference on May 7 and 8, 1996. During their negotiations with NBD, the Clamages determined that they could reach a global settlement of the adversary claim if Dalen contributed approximately $100,000 towards a larger settlement payment to NBD. Both Ed Clamage and Kubiesa testified that, at some point during the first day of the settlement conference, Ed Clamage approached Kubiesa with that settlement scenario. Kubiesa did not accept the offer and informed the Clamages that any settlement scenario should include payment _to_ Dalen rather than _from_ Dalen. As discussed in detail below, Kubiesa and Dalen dispute whether Kubiesa informed Dalen of Ed Clamage's settlement scenario.

Undeterred, the Clamages decided to communicate their settlement offer directly to Dalen. On or about May 21, 1996, Mack Clamage called Dalen and asked him to contribute between $75,000 to $100,000 to the settlement with NBD. Dalen refused, stating that (1) he had no intention of paying any money to the Clamages, (2) that, in any event, he had no money to contribute towards

a settlement, and (3) that he wanted the Clamages to pay him. Dalen informed Kubiesa of the phone call by facsimile and reiterated his position that "I had no money. Had no intention of paying any money and I wanted this settled." (Def. Ex. 9.)

Ultimately, Dalen's defense of the Clamages' adversary action was unsuccessful. On April 17, 1998, Judge Sonderby entered summary judgment against Dalen in the amount of $1.9 million. Dalen entered into an agreement to satisfy the judgment for $525,000. However, Dalen was unable to come up with the necessary funds to pay the settlement and eventually filed for bankruptcy in Michigan.

## ANALYSIS

To succeed in his malpractice claim, Dalen must prove (1) the existence of an attorney-client relationship giving rise to a duty owed to Dalen by Kubiesa, (2) a breach of that duty by Kubiesa, (3) injuries which were proximately caused by Kubiesa's breach, and (4) damages resulting from the injuries. *Barth v. Reagan*, 564 N.E.2d 1196, 1200 (Ill. 1990). An attorney commits actionable malpractice only if he or she fails to exercise a reasonable degree of care and skill. Conduct alleged to constitute legal malpractice must be measured against a standard of care that normally must be established by expert testimony. *Id.* at 1199-1200.

In spite of the somewhat complex transactions that form the backdrop of this case, plaintiff's sole remaining malpractice claim boils down to one simple factual dispute: did Kubiesa inform Dalen of his potential liability in Metropolitan's adversary action and the opportunity to settle that claim by paying the Clamages less than $100,000? Dalen testified that he was never told about the settlement opportunity and that he would have agreed to settle had he known of his potential exposure. Of course, Kubiesa provided conflicting testimony on this point. Therefore, the court's resolution of this factual dispute depends largely on a determination of the credibility of the witnesses. *United States v. Woods*, 233 F.3d 482, 484 (7th Cir. 2000) (at a bench trial the "trial judge is in the best position to judge the credibility of witnesses who offer conflicting testimony ....").

-4-

Dalen's case hinges on his testimony that Kubiesa never informed him about any settlement opportunity with the Clamages.[2] However, after observing Dalen's demeanor and weighing the substance of his answers, the court does not find this testimony credible. Dalen, at times, appeared evasive and his answers reflect that he was concerned with little other than getting paid by the Clamages and often did not pay attention to other matters in the bankruptcy. The court notes also what appears to be a pattern of deceptive and evasive behavior by Dalen during the events underlying this case. For example, Dalen readily admits that he lied to the Clamages during settlement negotiations by falsely telling them that he had no money for a settlement (while at the same time falsely telling the Clamages that he had opened a new flower store that could fund a protracted court battle). Moreover, Dalen admits that after the bankruptcy court entered the $1.9 million judgment against him, Dalen transferred his assets to his wife. While Dalen denies that he was trying to hide his assets from his creditors, he provided no other reasonable explanation. In a January 1997 fax to Kubiesa, Dalen boasts that he is "uncollectible," and that his cash assets "will be in Grand Cayman in my wives (sic) name. I will claim I gambled it away." Dalen's admitted pattern of evasive behavior undermines his credibility in the eyes of the court.

By contrast, the court attaches great weight to Kubiesa's testimony regarding the Clamages' settlement offer. Kubiesa testified that he attended the first day of the settlement conference along with the Clamages and representatives from NBD. He testified that an associate from his firm attended the second day of the conference and reported to Kubiesa after the conference was over. Kubiesa testified that (1) the Clamages approached him on the first day of the conference to discuss the possibility of a global settlement with a $100,000 contribution from Kubiesa, (2) because Dalen had repeatedly told Kubiesa that he had no intention of paying any money, Kubiesa told the

---

[2] Dalen's expert did not opine as to whether Kubiesa's alleged misconduct actually occurred and Dalen's other witnesses were not in a position to testify as to any conversations between Dalen and Kubiesa during the settlement negotiations.

Clamages that the settlement scenario would not work, and (3) Kubiesa called Dalen the day of the conference to discuss the settlement scenario advanced by the Clamages.[3] Kubiesa testified further that he told Dalen to accept the Clamages' settlement demand to avoid a possible $1.9 million liability. Dalen refused, and repeated his position that he did not want to settle unless <u>he</u> was paid.

Significantly, Kubiesa's testimony that he informed Dalen of the settlement offer is supported by contemporary billing records that were part of an invoice sent to Dalen in late May of 1996. Kubiesa's time records indicate that (1) Kubiesa called Dalen on the day that Kubiesa attended the first day of the settlement conference (Def. Ex. 3), and that (2) Kubiesa had several phone conversations with Dalen during the settlement negotiations, including one May 9, 1996 phone call that is recorded as "telephone conference with Mark Dalen regarding settlement possibilities." (Def. Ex. 4.) There is no evidence that Dalen ever complained to Kubiesa about these entries. The court finds Kubiesa's testimony credible and, in the main, supported by the documentary evidence.[4]

In short, the court finds that Dalen has failed to present the court with sufficient credible evidence to carry his burden of proof on a critical threshold element of his claim. He simply has not proven that Kubiesa engaged in misconduct constituting a breach of his duties to his client. Dalen's malpractice claim, therefore, cannot succeed.

---

[3] Dalen makes much of the fact that Kubiesa did not provide his advice in writing. However, Dalen's own expert, Bruce Wald, testified that, under certain circumstances, it is common, and appropriate, for counsel to provide legal advice of this nature over the phone. Specifically, Wald testified that it is common for attorneys to provide advice over the phone when they have had a longstanding relationship with the client. It is undisputed that Kubiesa had long served as Dalen's legal counsel and that, prior to this dispute, Dalen and Kubiesa were friends. Although it would have been prudent for Kubiesa to reduce his legal advice to writing, the court does not find that his failure to do so proves a breach of duty.

[4] Moreover, regardless of Kubiesa's actions during the settlement conference, it is apparent that Dalen knew about the settlement opportunity later in May of 1996. Mack Clamage testified, and Dalen confirmed, that Clamage called Dalen in late May to request that Dalen contribute $75,000 - $100,000 to a global settlement of the adversary action. In a fax sent to Kubiesa on May 21, 1996, Dalen described the phone call to Kubiesa and reiterated that he had no intention of settling unless he received money from the Clamages.

## CONCLUSION

For the foregoing reasons, the court finds in favor of defendants on Count III of plaintiff's complaint.

ENTER:

JOAN B. GOTTSCHALL
United States District Judge

DATED: November 9, 2004